UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------x
                      :

PAULA MARIE ELDERKIN        :          3:17 CV 90 (JGM)
                      :

V.                           :
                      :

NANCY A. BERRYHILL          :
ACTING COMMISSIONER OF SOCIAL  :
SECURITY                  :          DATE: FEBRUARY 5, 2018
                      :
-------------------------------------------------- x

RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE
COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A REHEARING,
AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Social Security Disability Insurance benefits ["DIB"].

## I. ADMINISTRATIVE PROCEEDINGS

On August 29, 2013, plaintiff applied for DIB benefits claiming that she has been

disabled since February 8, 2012 due to fibromyalgia, anxiety, carpal tunnel syndrome,

depression, high blood pressure, and endometriosis. (Certified Transcript of Administrative

Proceedings, dated March 21, 2017 ["Tr."] 249-51; see Tr. 129-30, 141-42, 279, 282, 297,

309). The Commissioner denied plaintiff's application initially and upon reconsideration. (Tr.

157-60, 163-65; see Tr. 128, 140, 161-62). Plaintiff requested a hearing before an

Administrative Law Judge ["ALJ"] (Tr. 185-86; see Tr. 166-70, 187-88), and on July 8, 2015,

plaintiff and Michael Laraia, a vocational expert, testified at a hearing before ALJ John Noel.

(Tr. 83-127; see Tr. 203-36).[1]  In a decision dated August 11, 2015, ALJ Noel denied

---

[1]Following the hearing, plaintiff's counsel submitted additional records for ALJ Noel's
review.  (See Tr. 37-70, 72-82); see Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996)("[N]ew
evidence submitted to the Appeals Council following the ALJ's decision becomes part of the

plaintiff's request for benefits.  (Tr. 17-32).  On August 19, 2015, plaintiff filed a request for review of the ALJ's decision (Tr. 14-16; <u>see</u> Tr. 329), and on September 30, 2016, the Appeals Council filed its notice denying plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 7-13).[2]

On January 23, 2017, plaintiff commenced this action (Dkt. #1; <u>see</u> Tr. 1-3 (granting additional time to file civil action); <u>see also</u> Tr. 4-6), and on February 24, 2017, the parties consented to this Magistrate Judge and the case was transferred accordingly.  (Dkt. #14). On April 10, 2017, defendant filed her answer and a copy of the Certified Administrative Transcript, dated March 21, 2017. (Dkt. #15).[3]  On June 9, 2017, plaintiff filed her Motion to Reverse, or in the alternative, Motion to Remand for a Rehearing (Dkt. #17), attached to which is her brief in support and a joint Stipulation of Medical Facts.  On August 9, 2017, defendant filed her Motion to Affirm, with brief in support.  (Dkt. #19; <u>see</u> Dkts. ##18, 20).

For the reasons stated below, plaintiff's Motion for Order to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #17) is <u>denied in part and granted in part such that the matter is remanded consistent with this Ruling</u>, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #19) is <u>denied in large part and granted in limited part</u>.

---

administrative record for judicial review when the Appeals Council denies review of the ALJ's decision.")

    [2]Plaintiff was represented by counsel at the administrative level (<u>see</u> Tr. 15-16, 71, 83, 153, 155, 172, 202, 247-48), and retained new counsel for this appeal.  (<u>See</u> Tr. 1-6).

    [3]There is a fair amount of duplication in the administrative record.

## II. FACTUAL BACKGROUND

### A. PLAINTIFF'S ACTIVITIES OF DAILY LIVING

Plaintiff was born in 1967 and is fifty years old.  (Tr. 279).  Plaintiff is single (Tr. 87); she lives with her family part-time, and otherwise lives alone with her dog. (Tr. 88, 289). To "the best of [plaintiff's] ability[,]" she cares for her mother, who is disabled, and she cares for her dog.  (Tr. 289, 291).

According to plaintiff, she only makes complete meals with assistance, and she can perform her own personal care "very carefully and slow due to pain and range of motion[.]" (Tr. 290-91).    Plaintiff does laundry, dishes, sweeps, vacuums, dusts, and does "very minimal" yard work (Tr. 292), and she shops for her groceries and household necessities. (Tr. 293). She spends time watching television, taking "short" walks, and doing "minimal planting [and] gardening with help[.]"  (Id.).

Plaintiff reported that she gets "moderate to severe anxiety at times" when with family or friends, although she does go to homes of her friends and occasionally goes out to dinner.  (Tr. 294).  However, at her hearing, she testified that she had not gone out with friends in "[a]t least a year." (Tr. 110-11).   She drives, but "sometimes get[s] anxiety from it[]"  (Tr. 88; see Tr. 109-10 (cannot drive distances)), and she has panic attacks when she is stressed, although she reported that she handles changes in routine "fairly well[.]" (Tr. 295).  Her anxiety causes her to feel like she cannot breathe, and she shakes and cries.  (Tr. 95).  Additionally, her anxiety affects her social life such that she "always cancel[s]" when she has plans to get together with her friends. (Tr. 96).

According to plaintiff, she can lift up to ten pounds, she is limited to standing, sitting and walking for brief periods of time due to her pain, and her hands cramp and become

numb which causes difficulty when driving.  (Tr. 294; <u>see</u> Tr. 102, 104-05 (she can lift about ten pounds, but her family does not let her lift because "they don't want [her] crying to them[]")).  She wears  "wrist/arm braces for carpal tunnel [and] numbness" and has done so for more than ten years.  (Tr. 295; <u>see also</u> Tr. 98-99).  Plaintiff testified that she cannot do her hair, and she can "probably" walk a half mile, if she "push[ed] [her]self."  (Tr. 100).  She cannot sit because she is restless, and she cannot sleep.  (Tr. 101; <u>see</u> Tr. 114).  She has pain in her back when she does dishes, and she does stretching exercises for her spine. (Tr. 102, 105-06).  Additionally, she has pain in her left collarbone, and her neck.  (Tr. 113).  According to plaintiff, she cannot work because she cannot "even get out of bed every day[,]" her hands cramp up and are "all twisted[,]" and she is unable to "do much housework at all."  (Tr. 94).  Plaintiff testified that when she has a flare-up of soreness, she is "in bed for a couple of days."  (Tr. 98).

Plaintiff also testified that she suffers from depression (Tr. 109) and has gained almost fifty pounds.  (Tr. 114). She takes or has taken Cymbalta, Gabapentin, Lisinopril, Lithium Carbonate, Verapamil, Diovan, Flexeril, Lyrica, Mobic, Norvasc, Oxycodone, Synthroid, Xanax, Lunesta and various vitamins. (Tr. 44, 285, 290).

Plaintiff worked as an office manager for Pioneer Gas from August 2008 to February 2012 or 2013 (Tr. 284, 322; <u>see</u> Tr. 323), and Hocon Gas from January 1992 to August 2008. (Tr. 89, 284, 322; <u>see</u> Tr. 324).   In her role as the office manager at Hocon Gas, plaintiff did accounting work and purchasing (Tr. 89), and for both employers, she supervised up to four people.  (Tr. 323-24).  She was also responsible for hiring and firing employees.  (<u>Id.</u>). Plaintiff's ability to kneel, crouch, and stoop while working was limited due to pain  (Tr. 323-24), and as of the time she worked at Pioneer Gas, her pain from fibromyalgia and arthritis

had "gotten a lot worse[]" which caused her "anxiety [to] set in." (Tr. 90; <u>see</u> Tr. 112). She was "let . . . go" from Pioneer Gas because she "just - - . . . could[ not] do the work anymore." (Tr. 93).

At her hearing, the vocational expert testified that a hypothetical person with the full range of medium work but who could only have occasional contact with the public, could not perform plaintiff's past work as an office manager (Tr. 118), but could work as a machine operator or cleaner, and could perform packaging work. (<u>Id.</u>). He also testified that if such a person was limited to only sitting, standing or walking for one hour at a time, with occasional balancing, stoopping, kneeling, crouching, and crawling, and frequent reaching with the left upper extremity, frequent fingering with both extremities, frequent climbing of ramps or stairs, never climbing ladders, and only occasional contact with the public, such person could not perform plaintiff's past work, nor could such person perform medium work. (Tr. 119-20). However, such a person could perform some light level work such as assembly positions, quality control work, or work as a machine tender, but the number of jobs would be diminished based on sitting, standing, and walking limitations. (Tr. 120-21). Similarly, at the sedentary level, such a person could perform the work of a quality control worker, assembler, or machine tender. (Tr. 121). If such a hypothetical person could perform a full range of light work, but only have occasional contact with the public, such person could be a machine operator, assembler, or packager. (Tr. 122). The number of those jobs would be reduced if such person was limited to a sedentary restriction. (Tr. 122-23). The vocational expert added that if such a person was off task fifteen percent of the time, employment would be precluded. (Tr. 123).

As discussed above, plaintiff's alleged onset date of disability is February 8, 2012; accordingly, while plaintiff's medical records date back to 2003 (see Tr. 409, 478, 522-654), plaintiff's treatment from 2012 forward will be discussed below.[5]

Plaintiff was seen on January 4, 2012 at the Arthritis Center of Connecticut's Rheumatology Division, under the care of supervising physician Brian Peck, MD, for fibromyalgia; at that time, she was "[o]verall well[,] doing well pain wise." (Tr. 347). Five days later, plaintiff was seen by her gynecologist who noted that plaintiff was healthy overall, with no complaints, and her musculoskeletal system, extremities, and neurology were within normal limits. (Tr. 363).[6] Plaintiff returned on February 4, 2012 to Jon Lum, PA-C, under the supervision of Dr. Peck, with complaints of back pain that she had "for quite a while[,] however [the pain was] not significant enough to warrant [a] cortisone injection." (Tr. 346, 521). Plaintiff was still experiencing anxiety at work, and muscle spasms were noted, as well as tenderness in the upper trapezius muscle groups. (Id.).

On February 29, 2012, the first date following plaintiff's alleged onset date of

---

[4]In addition to reviewing the entire administrative record before the Court, the Court relies on the parties' joint Stipulation of Medical Facts (see Dkt. #17, Exh. 2; Dkt. #19, Brief at 2).

[5]In March 2007, when plaintiff was still working full-time, she began treatment for low back pain, and there are several records in March, April and June 2007 related thereto. (See Tr. 589-92, 648-49, 653-54). Similarly, in October and November 2008, tender points were identified in her thoracic paravertebral spinal muscles (Tr. 570-71), and her left upper trapezius muscle group (Tr. 56-69). In March and April 2009, plaintiff complained of increased back pain and muscle spasms (Tr. 563-64), and in August 2009, she received trigger point injections. (Tr. 557-58).

From March to July 2010, plaintiff reported increased anxiety and stress over her job and legal matters. (Tr. 543-48; see also Tr. 537 (November 2010: complaints of stress at work)). From February through July 2011, plaintiff repeated her complaints of anxiety about work (Tr. 528-34), and she complained of increased pain. (Id.).

[6]See note 8 infra.

disability, plaintiff was seen by Lum for low back pain and fibromyalgia.  (Tr. 345, 520).

Plaintiff reported that her fibromyalgia was so severe at times that she was unable to

function.  (Id.).  Upon examination, muscle spasms were noted throughout "the entire

cervical, thoracic and lumbosacral paravertebral spinal muscles[,]" as well as "tender point

areas noted in all of the fibromyalgia tender point areas[.]" (Id.).[7]  A month later, plaintiff

returned to the Arthritis Center with complaints of back pain and increased anxiety.  (Tr. 344,

519).  She reported difficulty at her job and with her family, and Lum noted that plaintiff's

medication "does help her cope with the discomfort, and she's able to function in and around

her community." (Id.).  At her appointment on April 25, 2012, Lum noted that plaintiff's back

pain "comes and goes, and is dependent on the weather, as well as with activities."  (Tr.

343, 518).  He noted that her pain "could be weather related[,]" and that she is experiencing

a lot of anxiety at work, but Xanax "does help her." (Id.).[8]  On May 24, 2012, Lum noted

that plaintiff's pain "has slowly been getting worse[]"; she was assessed with chronic low

back pain, degenerative disc disease, osteoarthritis of the right and left knees, and fatigue

and increased pain, with etiology to be determined.  (Tr. 342, 517).  A month later, plaintiff

was assessed with acute back pain secondary to muscle spasms, and fibromyalgia.  (Tr. 341,

516).  On July 19, 2012, plaintiff reported increased back pain resulting from a long car ride

on a then-recent vacation.  (Tr. 340, 515).  A single tender point was identified along the left

thoracic paravertebral spinal muscles, and a cortisone injection was administered.  (Id.).

---

[7]Plaintiff underwent a bone density exam on March 13, 2012, which revealed osteopenia. (Tr. 377-78, 655).

[8]In May, November and December, 2012, plaintiff was seen and treated for endometriosis. (Tr. 365-66, 368, 375-76).  Plaintiff returned in February 2014, at which time plaintiff requested a hysterectomy.  (Tr. 372, 433).  On May 22, 2014, plaintiff's gynecologist recommended a total abdominal hysterectomy (Tr. 438), which was done on July 11, 2014. (See Tr. 446-47; see also Tr. 439-41 (pre-operative appointment); see also Tr. 442-44).

Lum also noted that plaintiff has "had anxiety for quite a while. It mainly stems from her place of business." (Id.). On August 15, 2012, plaintiff reported that the injection helped, but at the time of the appointment, she was feeling "a little more pain than she did in the past." (Tr. 339, 514). She also reported that her pain medication "help[ed] [her] cope better with the discomfort, and she [was] able to function in and around the community after taking it." (Id.). Upon examination, there were "muscle spasms noted through the entire cervical thoracic and upper trapezius muscle groups." (Id.).

When plaintiff returned to Lum in September, she reported that her current pain level was a nine on a scale to ten. (Tr. 338, 513). On October 11, 2012, plaintiff continued to report generalized pain with muscle spasms; she was assessed with chronic low back pain, degenerative disc disease and fibromyalgia. (Tr. 337, 512). On November 7, 2012, plaintiff's chief complaints were generalized pain and anxiety. (Tr. 336, 511). On December 4, 2012, Lum assessed plaintiff with chronic low back pain and degenerative disc disease. (Tr. 335, 510).

As of January and February 2013, plaintiff reported that the Oxycontin was not completely relieving her discomfort, and her anxiety, which was "mostly work related[,]" continued. (Tr. 333-34, 508-09). On June 11, 2013, plaintiff complained to Lum of chronic low back pain, with fibromyalgia and anxiety. (Tr. 332, 507). Lum noted plaintiff's "[h]istory of fibromyalgia, [and] [i]ncrease[d] global pains." (Id.). He added that at times, plaintiff is "[u]nable to function." (Id.). Plaintiff continued to report anxiety, and she also reported that she was "recently laid off." (Id.). A month later, plaintiff reported anxiety over unemployment, and Lum noted that plaintiff's pain medication relieved her discomfort and after taking her medication, she was "able to function in and around the community[.]" (Tr.

331, 506).   At her appointment on August 12, 2013, plaintiff's chief complaint was acute back pain and depression. (Tr. 330, 505).   On September 12, 2013, plaintiff no longer had insurance and was paying cash for her appointments; her unemployment and lack of insurance caused anxiety. (Tr. 504).   At that point, plaintiff was "[c]ontemplating disability." (Id.).   A month later, on October 15, 2013, plaintiff's chief complaint to Lum was her chronic low back pain, which "[u]nfortunately, [was so] severe [that] she [was] unable to work." (Tr. 503).   Lum also noted plaintiff's continued anxiety and depression over the loss of her job, and the loss of income. (Id.).   Plaintiff returned on October 22, 2013 for Lum to complete her disability paperwork.  (Tr. 502).   Lum's note reflected that plaintiff was "[u]nable to perform duties at work. She[] [was] just having [a] hard time physically and mentally." (Id.). On November 11, 2013, her complaints regarding her chronic low back pain were consistent with her prior appointments.  (Tr. 501).   A month later, on December 12, 2013, plaintiff's chief complaint to Lum was chronic pains, as well as increasing anxiety.  (Tr. 499-500).

Plaintiff returned to Lum on January 16, 2014 for her chronic back pain; she requested an injection, and Lum discontinued Xanax and started plaintiff on Valium.  (Tr. 498).   On January 22, 2014, plaintiff was seen for complaints of left shoulder pain; plaintiff requested a cortisone injection.  (Tr. 497).   Upon examination, Lum found muscle spasms throughout plaintiff's cervical and upper trapezius muscle groups, and identified two tender points in the left upper trapezius muscle groups before administering a cortisone injection. (Id.).  Plaintiff was seen again on February 11 and March 11, 2014 with continued complaints of back pain and anxiety.   (Tr. 495-96).   After identifying muscle spasms throughout plaintiff's cervical, thoracic, and upper trapezius muscle groups, and a single tender point between the scapula and thoracic spine, Lum administered a cortisone injection on March 17,

2014.  (Tr. 494).

On April 16, 2014, an MRI of plaintiff's low back revealed a small broad based central disc protrusion at L1-L2, with mild degenerative facet changes at this level but no evidence of nerve root compression.  (Tr. 414).  Additionally, at L2-L3, there was a mild disc bulge with degenerative facet changes; at L3-L4, there was minimal disc bulge and degenerative facet changes; and, at L5-S1 there was a small central disc protrusion, and minimal hypertrophic degenerative changes, but no evidence of nerve root compression.  (Id.).  The impression was "[m]ild degenerative changes throughout the lumbar spine. Small dis[c] protrusions at L1-2 and L5-S1. No evidence of neural compromise." (Id.).

On May 6, 2014, a gynecology note (Tr. 435-37) reflected that plaintiff did not complain of any fatigue, malaise or chronic stress conditions, but also noted that "Neurology: Positive for headaches, numbness, trouble walking, sensory symptoms and motor symptoms[,]" as well as positive for "depression, anxiety/panic, psychiatric illness and emotional distress." (Tr. 435).  Additionally, plaintiff was "[p]ositive for muscle weakness, swelling/muscle pain, joint pain, leg cramps and back ache." (Id.).  Seven days later, plaintiff was seen by Matthew Letko, PA-C at the Arthritis Center for acute back pain.  (Tr. 408).  Letko noted plaintiff's history of fibromyalgia syndrome and diffuse myalgias, and noted that plaintiff remained on medications for pain management which improved her overall pain level.  (Id.).   An x-ray of plaintiff's lumbar spine taken the same day showed scoliosis, convex between T2 and 3, and some possible narrowing between L5 and S1.  (Tr. 409).   Plaintiff returned to Lum on May 19, 2014 for acute back pain; a single tender point was identified along the left paravertebral muscles, and Lum administered an injection at that point.  (Tr. 407, 477).

On June 6, 2014, plaintiff underwent EMG testing for complaints of pain and numbness in her left shoulder, arm, and hand; the EMG testing was normal. (Tr. 422-24). Eleven days later, plaintiff returned to Lum complaining of "acute neck pains, with radiation to left shoulder, down left arm. Numbness to left hand." (Tr. 397-98, 475-76). Plaintiff also complained of anxiety about her finances. (Id.). On June 23, 2014, an MRI of her cervical spine revealed an incidental hemangioma within the C6 vertebral body, and there was no straightening of the cervical spine, likely related to muscle spasm. (Tr. 412, 425, 481). The specific results were as follows: at C3-C4, there was a minimal bulge with left foraminal narrowing related to osteophyte formation; at C4-C5, there was a small disc bulge with tiny right paracentral disc protrusion with mild asymmetric narrowing of the left C4-C5 neural foramen; at C5-C6, there was a small disc bulge with tiny right paracentral disc protrusion, but without evidence of cord or nerve root compression; at C6-C7, there was a broadly bulging disc resulting in a moderate degree of central spinal stenosis, effacing the subarachnoid space along the anterior surface of the cervical spinal cord, and the C6-C7 neural foramina were relatively stenotic bilaterally; and at C7-T1, there was a mild diffuse disc bulge without significant spinal stenosis or neural foraminal narrowing. (Id.). The impression was "cervical spondylosis from C3 to T1, with moderate central spinal stenosis at the C6-C7 level[, and] [t]he neural foramina [were] relative[ly] stenotic on the left at the C3-C4 and C4-C5 levels and bilaterally at C6-C7." (Id.).

Plaintiff underwent a cervical spine x-ray on July 16, 2014, the results of which showed continued straightening of the cervical spine indicating muscle spasms, and narrowing noted between C6 and C7. (Tr. 409). Her arthritic changes had worsened at C6 and C7, and osteophytes were noted at all levels, as well as a chip fracture at one of the

osteophytes at the lower levels.  (Id.).  On July 16 and again on August 18, 2014, Lum saw plaintiff for her chronic back pain, acute pain secondary to her then-recent hysterectomy surgery,[9] left shoulder pain, thyroid and depression.  (Tr. 394, 396, 403, 470, 472, 474).

Plaintiff underwent an MRI of her left shoulder on September 18, 2014 due to increased pain, decreased range of motion, tenderness and popping.  (Tr. 411, 462, 480).  The MRI revealed mild hypertrophic changes at the AC joint, and degenerative changes or abnormal signal in the three tendons of the rotator cuff, the supraspinatus, infraspinatus and subscapularis tendons consistent with tendonosis.  (Id.).  Four days later, plaintiff was seen by Lum for her acute back pain, as well as complaints of anxiety and depression.  (Tr. 402, 460, 469).  Lum noted that her intense pain in the right scapular area could be "referred pain" and she had arthritic changes throughout the entire thoracic spine.  (Id.).

On September 22, 2014, plaintiff was seen by Dr. Jonathan Parkhurst for her hypothyroidism.  (Tr. 419-20).  Two days later, Lum prescribed Lunesta for plaintiff (Tr. 404), and on September 29, 2014, plaintiff complained to Lum of "acute back pain from the left scapular."  (Tr. 401, 459, 468).  Plaintiff underwent an MRI of her thoracic spine on October 1, 2014 due to increased pain and tenderness and increased muscle spasms.  (Tr. 410, 461, 479).  There were "minor degenerative changes of the thoracic discs at several levels, with a small paracentral disc protrusion at the T7-T8 level and broad bulge of the disc at T10-T11, associated with facet and ligamentous hypertrophy bilaterally resulting in a minor degree of spinal stenosis."  (Id.).[10]

Plaintiff returned to the Arthritis Center on October 30, 2014 with neck and scapula

---

[9]See note 8 supra.

[10]On October 29, 2014, Lyme disease and rheumatoid arthritis testing was negative.  (Tr. 463-65, 483-85).

pain, as well as back pain that was making it "[h]ard to get out of bed in the a[.]m." (Tr. 458). On December 7, 2014, plaintiff had lumbosacral pain and left gluteal pain, which hurt all the time, hurt to the touch and while moving, and which pain sometimes went to the back of her leg. (Tr. 493). She had tenderness to palpation over multiple locations of her lumbosacral spine and gluteal areas; the assessment was myositis or myalgia and lumbrosacral pain. (Id.).

On January 6 and February 6, 2015, plaintiff's chief complaint was fibromyalgia syndrome. (Tr. 486-87). On March 9, 2015, plaintiff complained of neck pain, pain radiating to her upper back, and episodes of numbness in her hands, more so in the left than the right. (Tr. 491). Plaintiff reported that she continued to respond well to medications for pain management. (Id.).

On March 24, 2015, plaintiff was seen for "severe[]" neck pain (Tr. 49-53), during which appointment plaintiff was told that her "MRI findings do not completely explain all of her aches and pains[,] and that her overlying fibromyalgia may be playing a role in her presentation." (Tr. 52). Plaintiff returned on May 1, 2015 without any change to "severe" cervical back pain that was causing "persistent[]" pain in her neck. (Tr. 43, 54; see Tr. 43-48, 54-59). The next day, x-rays were taken of plaintiff's left shoulder, which revealed no acute fracture, and a "[h]ealed displaced fracture of the left clavicle middle third." (Tr. 65-66). On May 21, 2015, plaintiff received a left interlaminar C7/T1 epidural steroid injection. (Tr. 60-64).

C. MEDICAL OPINIONS

On November 23, 2013, Dr. Cheryl Ellis, a psychologist, performed a consultative psychiatric examination of plaintiff in connection with her application for benefits. (Tr. 351-

55).  Plaintiff reported that she was applying for disability because "she does not have a job, because her medical condition is getting worse, and she feels she can no longer work."  (Tr. 351).  Plaintiff reported that her anxiety comes on spontaneously (Tr. 351-52), Xanax was not working and she is unable to see a therapist because she does not have insurance.  (Tr. 352).  Plaintiff reported needing no assistance with daily living skills; she worries in social settings; and she has no difficulty maintaining attention and focus, and can follow simple instructions.  (Tr. 354).  Dr. Ellis opined that plaintiff's mental health prognosis is good "secondary to appropriate psychotherapy and medication[,]" and she "appears to have clear ability to reason and understand[,]" as well as to establish positive relationships, interact with others and concentrate.  (Tr. 355).

On December 3, 2013, Dr. Yacov Kogan performed a consultative physical examination of plaintiff in connection with her disability application.  (Tr. 356-59).  Plaintiff reported "chronic pain affecting the entire posterior torso and the upper and lower extremities bilaterally and diffusely for several years."  (Tr. 356).  She reported "tenderness to palpation involving the entire posterior torso and the upper and lower extremities bilaterally and diffusely[,]" and upon examination, there were no range of motion deficits and no neurological deficits that limited plaintiff's ability to sit, stand, walk, bend, lift, carry, reach, or perform fine finger manipulation.  (Tr. 358).  Dr. Kogan noted that these "activities are mildly limited due to generalized musculoskeletal pain."  (Id.).  Plaintiff also reported that her depression and anxiety were "managed on Cymbalta and Xanax."  (Tr. 356).  Dr. Kogan found that plaintiff has a "preserved level of consciousness, language, memory and concentration[,]" and work related activities involving speaking, comprehending, remembering and carrying out instructions were not limited.  (Tr. 358).

On December 17, 2013, Gregory Hansen, Ph.D., a State-agency medical consultant, completed a Psychiatric Review Technique of plaintiff for SSA (Tr. 132-33), in which he opined that plaintiff's anxiety-related disorder causes mild restrictions in her activities of daily living; moderate difficulties maintaining social functioning, concentration, persistence or pace; and one or two episodes of decompensation, each of extended duration. (Tr. 133). On the same day, Dr. Hansen completed a Mental Residual Functional Capacity Assessment of plaintiff (Tr. 135-37), in which he found that plaintiff has sustained concentration and persistence limitations; she is moderately limited in her ability to maintain attention and concentration, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 136). Additionally, Dr. Hansen opined that plaintiff is moderately limited in her ability to interact appropriately with the general public, and to get along with coworkers or peers without distracting them; he noted that "[a]lthough others might be distracted by her evident emotional and physical pain, she has substantial experience as [an] office manager, and is able to talk to people, ask questions, keep reasonable appearance, [and] cooperate with authorities." (Tr. 136-37). Dr. Hansen added that plaintiff would work "[b]est in nonpublic settings until [she] engaged in meaningful pain therapy/pain management." (Tr. 137).

In a Residual Functional Capacity assessment completed on December 30, 2013, Dr. Earle Sittambalam, a State-agency medical consultant, opined that plaintiff can occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; and, sit, stand and/or walk for about six hours in an eight-hour workday. (Tr. 134-35).

On March 11, 2014, Dr. Richard Papantonio, a State-agency medical consultant,

completed a Physical Residual Functional Capacity Assessment in which he reached the same conclusions as Dr. Sittambalam. (Compare Tr. 146-47 with Tr. 134-35). Similarly, on March 12, 2014, Robert Deutsch, Ph.D., a State-agency medical consultant, completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment for SSA on behalf of plaintiff in which he reached the same conclusions as Dr. Hansen. (Compare Tr. 144-45, 147-48 with Tr. 133, 136-37). Dr. Deutsch noted that plaintiff "would best work in a setting without requirements to work with the general public given anxiety regarding groups of people, and may at times present [distracting] behaviors though likely related to physical pain. Can relate [within normal limits] with coworkers[] [and] supervisors and ask for assistance." (Tr. 148).

### III. DISCUSSION

Following the five step evaluation process,[11] ALJ Noel found that plaintiff has not engaged in any substantial gainful activity since February 8, 2012, the alleged onset date. (Tr. 22). ALJ Noel then concluded that plaintiff has the following severe impairments:

---

[11]Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520 First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. See id. If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. See 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

fibromyalgia, anxiety disorder, and degenerative disc disease. (Tr. 22-26, <u>citing</u> 20 C.F.R. § 404.1520(c)). In the third step of the evaluation process, the ALJ concluded that plaintiff's impairment or combination of impairments does not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404. (Tr. 26-27, <u>citing</u> 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). In addition, at step four, ALJ Noel found that after consideration of the entire record, plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she can only sit, stand or walk for one hour at a time before having to change position; she can occasionally balance, stoop, kneel, crouch and crawl; she can frequently reach with her left upper extremity; she can frequently finger with both extremities; she can frequently climb ramps and stairs, but can never climb ladders, ropes and scaffolds; she can never be around unprotected heights; and she can have only occasional contact with the public. (Tr. 27-30). He further found that plaintiff was unable to perform any past relevant work, but considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform, such that she is not disabled. (Tr. 30-32).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ did not consider the evidence of record relating to the severity of plaintiff's spinal impairment (Dkt. #17, Brief at 14-21); the ALJ erred in his credibility determination (<u>id.</u> at 21-25); and the vocational analysis was inconsistent with plaintiff's impairments and failed to produce "significant" numbers of jobs available in the economy (<u>id.</u> at 25-29).

Defendant contends that the ALJ properly found that plaintiff's impairments did not meet or equal the criteria of any Listing (Dkt. #19, Brief at 5-15); the ALJ properly assessed plaintiff's credibility (<u>id.</u> at 15-20); the ALJ reasonably determined that plaintiff could perform

work in the national economy (id. at 20-22); and the ALJ reasonably relied on the vocational expert's testimony regarding the number of jobs available in the economy. (Id. at 22-25).

## A. LISTINGS LEVEL IMPAIRMENT

At step three, the ALJ, addressing Listing 12.06 for anxiety disorder (see Tr. 26-27), concluded that plaintiff has a mild restriction in performing her activities of daily living; plaintiff has moderate difficulties with social functioning; she has no difficulties with concentration, persistence or pace; and she has experienced no episodes of decompensation. (Id.). Plaintiff contends that the ALJ erred in his failure to discuss, let alone mention, Listing 1.04, regarding plaintiff's cervical spine impairment. (Dkt. #17, Brief at 15-16). Additionally, plaintiff contends that the ALJ failed to consider plaintiff's chronic pain, numbness and range of motion limitation from the anatomical deformity of her left clavical or the impact of inflammation and degeneration of her left rotator cuff and left shoulder tendons, in combination with plaintiff's cervical spine impairment. (Id. at 14-15). Defendant counters that the ALJ properly found that plaintiff's impairments did not meet or equal the criteria of any Listing, and there is "no material error in the ALJ choosing not to specifically describe his analysis of Listing 1.04 because there is no way that plaintiff's alleged impairments could have met or medically equaled the Listing criteria." (Dkt. #19, Brief at 5).

The failure to mention a specific Listing "does not require a remand . . . if other portions of the ALJ's decision show that substantial evidence supports the conclusion that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." Machnicz v. Berryhill, No. 3:16 CV 741 (MPS), 2017 WL 2294284, at *2 (D. Conn. May 25, 2017)(citation, alteration & internal quotations omitted); see also Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109,

112 (2d Cir. 2010)("[T]he absence of an express rationale for an ALJ's conclusion does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'"), quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982). That said, the ALJ's decision must include an explanation of why a claimant's impairment failed to meet or equal a Listing, and "it is the ALJ's responsibility–and not the job of the Commissioner's attorney–to 'build an accurate and logical bridge from the evidence to [his or her] conclusion to enable a meaningful review.'" Loescher v. Berryhill, No. 16 CV 300 (FPG), 2017 WL 1433338, at *3 (W.D.N.Y. Apr. 24, 2017), quoting Hamedallah ex rel E.B. v. Astrue, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012). In this case, while the Commissioner offers a thorough argument as to why plaintiff's impairment would not satisfy Listing 1.04 (see Dkt. #19, Brief at 6-11), the ALJ's discussion is not sufficient to draw that conclusion.

To satisfy Listing 1.04A, plaintiff must establish that she suffers from a disorder of the spine,

> (e.g., herniated nycleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root . . . or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Pt. 404, Subpt. P., App. 1, 1.04A.

In this case, plaintiff has several MRIs in the record, most of which do not satisfy the first part of Listing 1.04A. (See Tr. 410, 461 ("[m]inor" thoracic spondylosis and "[n]o evidence of . . . significant disc herniation"); see Tr. 414 (mild degenerative changes

throughout the lumbar spine, but no evidence of neural compromise)). However, as the ALJ noted in his decision, the 2014 MRI of plaintiff's cervical spine revealed "cervical spondylosis from C3 to T1, with moderate spinal stenosis at the C6-C7 level[,]" with relatively stenotic neural formamina at C3 through C7. (Tr. 25, 29, citing Tr. 412, 425). Those results also revealed a "hemangioma at C6 vertebral body." (Tr. 412, 425). In his discussion of the severity of plaintiff's impairments, the ALJ referred to plaintiff's 2012-2013 records from the Arthritis Center by referencing her diagnoses, and by noting that her back pain "was transient in nature[]"; her pain was "often related to weather as well as physical exertion[]"; "[f]or the most part, pain medications did help to relieve the discomfort"; and plaintiff was able to function in the community after taking them. (Tr. 23). Those references are recited almost verbatim in most all of the medical records from the Arthritis Center. (See Section II.B. supra). However, the medical records also include specific references to her tender points, muscle spasms, and pain over the course of many years, and, as the ALJ acknowledged later in his decision, the record "indicates that the claimant continued to experience chronic daily pain related to lumbar degenerative disc disease[,]" and she had "diffuse myalgias related to fibromyalgia syndrome." (Tr. 25).

In his discussion at step two, the ALJ focused on few medical notes, yet, even in his limited references, he noted plaintiff's extensive muscle spasms and complaints of severe pain, for which she was prescribed pain medications and received cortisone injections.[12] Specifically, he noted that in "July of 2012," plaintiff had a single tender point along the left thoracic paravertebral spinal muscles for which she received a cortisone injection, there were

---

[12]Conversely, at step four, he had a limited discussion of plaintiff's treating physicians' records; he focused, instead, on Dr. Kogan's findings. (Tr. 29).

muscle spasms throughout the entire cervical, thoracic, and upper trapezius muscle groups, and there was crepitation in her range of motion as she was getting into position for her cortisone injection. (Tr. 23).[13] He also referred to August and September 2014 and March 2015 medical notes from the Arthritis Center, as well as the thoracic MRI taken in October 2014,[14] and the left shoulder MRI taken in September 2014. (Tr. 24-25). Specifically, the ALJ recited that the "August of 2014" note from Lum relating to plaintiff's left shoulder pain and back pain, reflected that plaintiff was "in moderate distress[];" her "left scapular had popping on range of motion[;]" there was "decreased range of motion[]"; and there was "tenderness on palpation . . . ." (Tr. 24).[15] As for the September 2014 record, the ALJ noted that plaintiff received a cortisone injection in her left back area; an MRI revealed arthritic changes in her right shoulder; plaintiff had arthritic changes throughout her entire thoracic spine; she was "unable to enjoy activities with her family and friends[]"; she was in "moderate distress[]" upon examination; and "[t]here were muscle spasms noted throughout

---

[13]Similarly, upon examination on February 29, 2012, the first date following plaintiff's alleged onset date of disability, Lum noted muscle spasms throughout "the entire cervical, thoracic and lumbosacral paravertebral spinal muscles[,]" as well as "tender point areas noted in all of the fibromyalgia tender point areas[.]" (Tr. 345, 520). On May 24, 2012, Lum noted that plaintiff's pain "has slowly been getting worse[.]" (Tr. 342, 517). A month later, plaintiff was assessed with acute back pain secondary to muscle spasms, and fibromyalgia (Tr. 341, 516); she received a cortisone injection on July 19, 2012. (Tr. 340, 515). Upon examination in August 2012, there were "muscle spasms noted through the entire cervical thoracic and upper trapezius muscle groups." (Tr. 339, 514).

[14]Plaintiff underwent this MRI due to increased pain and tenderness and increased muscle spasms. (Tr. 410, 461, 479).

[15]The record also shows that upon examination in January, and then in February and March 2014, Lum found muscle spasms throughout plaintiff's cervical and upper trapezius muscle groups; a cortisone injection was administered on March 17, 2014. (Tr. 494-96). On May 6, 2014, plaintiff's gynecology note reflected that plaintiff was positive for muscle weakness, swelling/muscle pain, and joint pain. (Tr. 435). Plaintiff received another injection for her acute back pain in May 2014. (Tr. 407, 477).

the entire cervical, thoracic, and upper trapezius muscle groups." (Tr. 24).[16]

Despite this discussion at step two of the ALJ's decision, at step three, there is no mention of plaintiff's physical impairments, let alone of Listing 1.04.[17] As stated above, decreased range of motion and distribution of pain are relevant to the criteria necessary to satisfy Listing 1.04A. That said, in order to satisfy Listing 1.04A, plaintiff must demonstrate that she suffers from nerve root compression and each of the four characteristics set forth in the Listing during the relevant time period, as "'[a]n impairment that manifests only some of those criteria, no matter how severe, does not qualify.'" Rosario v. Astrue, No. 3:11 CV 314 (MRK)(WIG), 2012 WL 3728143, at *3 (D. Conn. Feb. 13, 2012)(Garfinkel, MJ), quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)(additional citation omitted).[18] Thus, while it is not within the province of this Court to determine whether plaintiff's impairments, or the combination of her impairments, reached Listing level severity, this Court must consider whether this ALJ's decision includes substantial evidence to support the conclusion that plaintiff "does not have [a physical] impairment or combination of [physical] impairments

---

[16]In his decision, the ALJ also cited a 2014 report in which plaintiff rated her pain at a nine on a scale to ten, which the ALJ appropriately dismissed as the note "did not provide any further explanation." (Id.).

As reflected in plaintiff's medical record, at the end of October 2014, plaintiff was seen for neck and scapula pain, as well as back pain that was making it "[h]ard to get out of bed in the a[.]m." (Tr. 458). On December 7, 2014, plaintiff had lumbosacral pain and left gluteal pain, which hurt all the time, hurt to the touch and while moving, and which pain sometimes went to the back of her leg. (Tr. 493). She had tenderness to palpation over multiple locations of her lumbosacral spine and gluteal areas; the assessment was myositis or myalgia and lumbrosacral pain. (Id.). In March 2015, plaintiff complained of pain radiating to her upper back, and episodes of numbness in her hands, more so in the left than in the right. (Tr. 491).

[17]See note 15 supra.

[18]While plaintiff relies on an April 4, 2007 medical note that evidenced decreased resistance and muscle weakness due to "radiculopathy with possible compressive neuropathy from disc disease" (see Tr. 591), plaintiff's onset date of disability is not until 2012.

that meets or medically equals the severity of one of the listed impairments." Machnicz,

2017 WL 2294284, at *2 (citation & internal quotations omitted).    In light of the medical

evidence in this case, including evidence that the ALJ referenced in his severity determination

but not at step three, the ALJ's decision does not "build an accurate and logical bridge from

the evidence to [his] conclusion to enable a meaningful review.'" Loescher, 2017 WL 143338,

at *3 (citation & internal quotations omitted); see also Stango v. Colvin, No. 14 CV 1007

(CSH), 2016 WL 3369612, at *15 (D. Conn. June 17, 2016)(cursory analysis at step three is

insufficient as a matter of law when the ALJ failed to provide an explanation for her

conclusion).    Accordingly, under the circumstances of this case, plaintiff "was owed a

discussion of how the evidence failed to establish that she met Listing 1.04A." Kerr v.

Astrue, No. 09 CV 01119 (GLS), 2010 WL 3907121, at *5 (N.D.N.Y. Sept. 7, 2010)(citation

omitted), Magistrate Judge's Recommended Ruling approved and adopted, 2010 WL 3893922

(N.D.N.Y. Sept. 30, 2010).[19]

Plaintiff also contends that the ALJ erred in his conclusion that "there is no evidence

regarding carpal tunnel[,]" (Tr. 29), when the medical records reflect symptoms and a

diagnosis of such impairment.   (Dkt. #17, Brief at 16-17).   However, as plaintiff implicitly

acknowledges in her brief, with the exception of a listed reference in the "Active Problems"

section of a 2014 medical note (Tr. 418; see also Tr. 420 (carpal tunnel not listed on the

Assessment list reflecting the then-current medical issues)), all of the records related to

plaintiff's diagnosis and treatment for carpal tunnel  pre-dated her onset date of disability by

---

[19]At step four, the ALJ included in his residual capacity assessment, limitations relating to
plaintiff's physical impairments.  In his decision, the ALJ concluded that plaintiff is limited to sitting,
standing, or walking for one hour at a time before having to change position, which the ALJ stated
would "accommodate[ ] any pain or discomfort the claimant may experience by providing the
ability to change position at least every hour." (Tr. 27, 29).

two, seven and eight years, respectively. (See Tr. 406, 542, 622, 626-33). Thus, the ALJ did not err in his treatment of plaintiff's carpal tunnel syndrome.

Similarly, the ALJ did not err in his treatment of plaintiff's left clavicle deformity. As discussed above, at step two, the ALJ referred to plaintiff's 2014 MRI of her left shoulder. (Tr. 24-25). Plaintiff underwent the 2014 MRI of her left shoulder due to increased pain, decreased range of motion, tenderness and popping. (Tr. 411, 462, 480). The MRI revealed mild hypertrophic changes at the AC joint, and degenerative changes or abnormal signal in the three tendons of the rotator cuff, the supraspinatus, infraspinatus and subscapularis tendons consistent with tendonosis. (Id.). Plaintiff contends that the ALJ failed to consider this impairment in combination with her spinal impairment, under the medical equivalence standard. (See Dkt. #17, Brief at 16 & 19-20). However, as defendant correctly notes in her brief, there is a listing relating to shoulder impairments, namely, Listing 1.02B, but plaintiff's left clavicle deformity does not meet Listing 1.02. (See Dkt. #19, Brief at 10-11). Unlike the ALJ's discussion relating to plaintiff's spinal impairment, the ALJ's decision regarding plaintiff's shoulder impairment is clear as he references the one occasion in which an examination found decreased left scapular range of motion (see Tr. 24; see also Tr. 394), as well as the only other range of motion examination which showed normal motion bilaterally. (Tr. 24, 29; see Tr. 358). Additionally, although plaintiff underwent an EMG in June 2014 for plaintiff's complaints of pain and numbness in her left shoulder, arm and hand (see Tr. 422-24; see also Tr. 397, 475), the ALJ accurately noted that the results of that EMG were normal. (Tr. 25). The medical equivalence standard, as set forth in the Regulations, provides that an impairment is considered "medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §

404.1526(a)(emphasis added). Plaintiff's shoulder impairment differs from her spinal impairment in that there is limited treatment, all of which is referenced by the ALJ in his decision. In order for plaintiff's shoulder impairment to satisfy Listing level severity, there must be "abnormal physical findings . . . over a period of time . . . established by a record of ongoing management and evaluation." 20 C.F.R. Part 404, Subpt. P, App. 1, 1.00D.[20] Accordingly, it is clear from the ALJ's decision that plaintiff's shoulder impairment could not meet Listing level severity, neither for Listing 1.02, nor as medically equivalent to a Listing when combined with plaintiff's spinal impairment.

B. PLAINTIFF'S REMAINING ARGUMENTS

Because plaintiff's credibility and the ALJ's step five analysis are dependent on the ALJ's findings at step three regarding plaintiff's spinal impairment, the ALJ is directed to address these issues upon remand in light of the conclusion reached herein.

IV. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #17) is granted in limited part such that the case is remanded consistent with this Ruling, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #19) is granted in part and denied in part.

Dated at New Haven, Connecticut, this 5th day of February, 2018.


_/s/ Joan G. Margolis, USMJ_
Joan Glazer Margolis
United States Magistrate Judge

---

[20]In the absence of medical records to satisfy this preliminary requirement of the musculoskeletal listings, the Court need not address the specifics of Listing 1.02.